IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

LAURA TIDWELL BOOK,                    *

        Plaintiff,                     *

vs.                                    *

STATE OF GEORGIA DEPARTMENT OF         *       CASE NO. 4:21-cv-81 (CDL)
ECONOMIC DEVELOPMENT, MARK
JARONSKI, KAREN HAMPTON, and           *
LATIVIA RIVERS, in their
official capacities.                   *

        Defendants.                    *

_____

## O R D E R

Defendant Georgia Department of Economic Development (the "Department") employed Plaintiff Laura Tidwell Book at the Columbus Welcome Center (the "Center") as a visitor information specialist. She claims that the Department discriminated against her because of her race and disabilities. She also contends that the Department retaliated against her for complaining of discrimination and for taking medical leave. Book brings claims against the Department under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112 *et seq.*, the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* The Department filed a summary judgment motion as

to all of Book's claims.  For the following reasons, the Department's Motion for Summary Judgment (ECF No. 30) is granted.[1]

### SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

### FACTUAL BACKGROUND

Viewed in the light most favorable to Book, the record reveals the following facts.

### I.   Book's Employment at the Center

Laura Book is a white woman with multiple disabilities, including bipolar disorder, depression, and slow rapid recall

---

[1] Book also asserts claims against Mark Jaronski, Karen Hampton, and Lativia Rivers in their official capacities.  Those claims are construed as claims against their employer, the Department.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

stemming from a pediatric brain tumor.  She began working at the Department as an Information Specialist in September 2013.  In that role, Book greeted visitors and provided them with information about Georgia events and attractions.  Information Specialists must be present on-site at the Center according to a schedule controlled by the Center's manager.

## II.  Book's Conflicts with her Supervisors and Coworkers

During her employment at the Center, two different managers supervised Book: Lynn Hadden (September 2013 to September 2015) and Lativia Rivers (May 2016 to October 2020).  Book experienced conflict with both supervisors throughout her employment.  Book claims that Hadden discussed Book's private medical information with other employees and mocked Book for having "cats in [her] head."  Book Dep. 43:17, ECF No. 32.  Sometime after this incident, Hadden placed Book on a performance improvement plan for various performance issues.  The Department eventually took Book off the performance plan after she and her attorney met with Hadden, Human Resources Director Karen Hampton, and Director of Visitor Information Centers Brittany Gray.  Book's attorney memorialized the meeting by emailing the Department's general counsel and informing him that Book was concerned she was being discriminated against because of her "documented disability."  Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 3, Letter from H. Champion to A. Capezutto 1 (June 2, 2015), ECF No. 38-7.  Nonetheless, Book's attorney

stated that the meeting ended amicably and that she hoped that all parties could move forward.  *Id.*

The next year, Rivers became the Center's new manager and Book's new supervisor.  Within a few months, Book and Rivers butted heads.  For example, after Book informed Rivers, who is black, that two black employees referred to Rivers as the "N" word and joked that she was on "colored people time," Book Dep. 64:21-22, Rivers scolded and belittled Book by telling her that she had "no right to be offended" by the use of those terms because she was white.  *Id.* at 63:20-64:4.

Following the "N" word incident, Book continued to struggle to get along with Rivers and her coworkers.  Book made multiple complaints to Rivers about her coworkers and Rivers, and several coworkers complained about Book.  Rivers consolidated these complaints and reported them to the Department.  In that report, Rivers explained that Book's coworkers were uncomfortable working with Book because she intentionally caused conflict, was easily offended, and made false accusations about others.  Rivers Decl. ¶ 14, ECF No. 30-83; Rivers Decl. Ex. 3, Email from L. Rivers to R. Clopp at DEF00000909 (Feb. 22, 2017, 6:13 PM), ECF No. 30-83 at 11.  Rivers noted that an employee told her that she was uncomfortable working alone with Book because Book stared at her while they worked.  Email from L. Rivers to R. Clopp at DEF00000909, ECF No. 30-83 at 11.  Rivers reported that Book always

called her on Rivers's days off to complain about something. Rivers responded by attempting to change the schedule so that she would be on duty at the same time as Book "to try to avoid some of the conflict." *Id.* According to Rivers, Book accused Rivers of favoritism and reported that a coworker told Book that Rivers said she did not believe Book could pass the Travel Counselor's Exam; that coworker denied making such a statement to Book and told Rivers that Book "takes conversations and switches them around." *Id.* Rivers also reported that Book yelled across the Center lobby to Rivers and another employee, "I see you all talking about me!" *Id.* Later that year, a member of the janitorial staff reported Book for harassment.

A few months later, Book and coworker Jonathan Spearman engaged in a verbal dispute in the lobby of the Center after a guest complained about Spearman and a janitor discussing politics and other personal matters. Defs.' Mot. Summ. J. Ex. 36, Email from L. Rivers to K. Hampton 2–3 (July 24, 2017, 10:58 AM), ECF No. 30-39. Book, upset by the altercation, left for lunch early. *Id.* at 2. When Book returned, Rivers reassured Book that she could always speak to her if she felt uncomfortable. *Id.* at 3. Soon after, Rivers told the Center's employees at a staff meeting that if they could not get along, then she would write them up. Defs.' Mot. Summ. J. Ex. 17, Email Exchange Between L. Book and K. Hampton 1 (July 25, 2017, 4:56 PM), ECF No. 30-20. Book construed Rivers's

statement to mean she would be disciplined for reporting legitimate issues, and she reported to Hampton what Rivers said. *Id.* at 3 (July 21, 2017, 1:48 PM). After speaking with Rivers, Hampton concluded that Book had taken Rivers's statement out of context. *Id.* at 1 (July 25, 2017, 4:56 PM). Hampton told Book that she would not be written up for reporting legitimate incidents or issues. *Id.* Hampton also advised Book that Rivers was frustrated with the level of conflict Book had with her coworkers, and she asked for Book's suggestions on how to "find a solution" for Book and her coworkers to "successfully interact and cooperate with one another." *Id.* Hampton also stated that she wanted to work with Book to "find a way to help [Book] be able to focus on doing a good job and not on what [her] coworkers and/or manager may or may not have said or done." *Id.*

Book continued to have trouble working peacefully with others, particularly Spearman. In February 2018, the Department placed Book and Spearman on a "Communications and Work Plan" because of their frequent conflict. Defs.' Mot. Summ. J. Ex. 27, Communications and Work Plan Email 1 (Feb. 7, 2018, 4:07 PM), ECF No. 30-30; Book Dep. Ex. 12, Communication/Work Plan 1–2, ECF No. 32-12. The plan instructed the two to attempt to resolve any dispute with each other before going to management. Communications and Work Plan Email 1. The plan also directed Book and Spearman to be courteous with each other and other coworkers, not to discuss

personal matters at work, not to gossip or make accusations against others, to be punctual, and not to take excessive breaks.

After the Department placed her on the Communications and Work Plan, Book continued to have problems working under Rivers. Book's struggle with Rivers boiled down to Rivers's management style and Book's perception that Rivers treated some employees more favorably despite them completing inferior work, fewer tasks, and taking extended and more frequent breaks. Book Dep. 174:24–175:6, 178:24–180:9. These difficulties culminated with Book accusing Rivers of having a "disrespectful attitude" in a strongly-worded email sent to both Rivers and Hampton. Defs.' Mot. Summ. J. Ex. 20, Email from L. Book 1 (Apr. 17, 2018, 4:39 PM), ECF No. 30-23. Rivers's supervisor found that Book's email was unprofessional, and she placed a "Memorandum of Concern" in Book's employment file explaining that Book needed to communicate more professionally with others, or the Department would take additional disciplinary action against her up to and including termination. Hampton Decl. Ex. 9, Memorandum of Concern at DEF00002694, ECF No. 30-82 at 31.

## III. Book's Sharing of Personal Information with Visitors

In addition to her problems getting along with others, Book often discussed her personal life with visitors despite multiple warnings from Rivers and Hampton that such behavior was inappropriate and should not happen. Eventually, in February 2020,

Hampton issued Book a "final warning," meaning that if Book continued to discuss personal matters with visitors, then she may be subject to discipline, including immediate termination. Defs.' Mot. Summ. J. Ex. 12, Email from K. Hampton to L. Book 1 (Feb. 11, 2020, 11:34 AM), ECF No. 30-15. A month later, Hampton had to warn Book again not to discuss her personal life with visitors.

## IV. Book's Requests for Leave

Throughout her employment, Book intermittently took sick leave when she felt ill. Her various requests for sick leave included a wide variety of afflictions, including a cough, shivers, high blood pressure, dermatologic issues, gastrointestinal problems, and sinus infections caused by air fresheners. Book also sought leave because of conflicts with coworkers and when she deemed it to be "slow." Book Dep. 188:17–18. Book often made these requests at the last minute with less than twenty-four hours' notice. The Department informed Book at least twice that her frequent, last-minute requests made it difficult to ensure business needs were met and that the Center was adequately staffed. Nonetheless, the Department granted most of these requests.

From July 2019 to early September 2019, Book took FMLA leave for a hysterectomy. Shortly after Book returned from FMLA leave, Book developed a tumor on her head and her requested leave became longer and more frequent. Defs.' Mot. Summ. J. Ex. 48, Collected Emails Regarding Sick Leave at DEF00001898 (Sept. 23, 2019, 1:53

PM), ECF No. 30-51 at 30; Defs.' Mot. Summ. J. Ex. 49, Email from L. Book to L. Rivers and K. Hampton 1 (Nov. 6, 2019, 11:24 AM), ECF No. 30-52.  The Department allowed Book to take leave on short notice while Book attended doctors' appointments to treat the pain arising from the tumor and consult with a surgeon.  Collected Emails Regarding Sick Leave at DEF00000580 (Nov. 7, 2019, 4:25 PM), ECF No. 30-51 at 31.  When Book informed Hampton that she would be getting surgery to remove the tumor, Hampton brought up the possibility of Book taking FMLA leave.  Book never had the surgery.

Early the next year, Book began suffering from mental health issues.  On February 26, 2020, Book requested to leave work early to go to a psychiatrist to get on new medication.  Rivers granted that request.  On March 5, 2020, the Department received a note from a mental health hospital stating that Book had been admitted from February 27 until March 6, 2020.  The Department granted Book leave for this period and notified her that since she was running low on sick leave, she would need to use annual leave if she needed more time off.  On March 13, 2020, the Center closed due to the onset of the COVID-19 pandemic.  It remained closed to visitors until August 2020.

In late September 2020, Book requested leave for two more weeks because of an "emotional illness."  Defs.' Mot. Summ. J. Ex. 72, Doctor's Letter 1 (Oct. 5, 2020), ECF No. 30-75.  The

Department granted her request and told her that since she was running low on sick leave, she would need to use other leave to cover the difference between her time off and remaining sick leave balance. Book notified Rivers that she would be back to work on October 12 "if possible." Defs.' Mot. Summ. J. Ex. 70, Email Exchange Between L. Book and L. Rivers 2 (Oct. 9, 2020, 10:13 AM), ECF No. 30-73. Book also stated that she would need to take more time off later that year for doctors' appointments due to "unresolved health issues" causing her "excruciating pain." *Id.* (Oct. 7, 2020, 8:41 AM). Specifically, Book noted to Rivers that she would need November 4 off for a follow-up appointment with a neurologist so that he could investigate the cause of her pain and refer her to a neurosurgeon for the "tumor on [her] face." *Id.* at 1 (Oct. 10, 2020, 4:16 PM). After Book returned to work, she informed Rivers that she would most likely need surgery before the end of the year to remove the "giant tumor on [her] face." Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 5, Email from L. Book to L. Rivers Regarding Surgery 1 (Oct. 15, 2020, 8:05 AM), ECF No. 38-9.

**V.   Book's Termination**

On September 23, 2020, before Book took the two-week medical leave, Book sent an accusatory email about her coworker to her supervisor, copying the coworker and Hampton. Defs.' Mot. Summ. J. Ex. 74, Email from M. Jaronski to P. Wilson Recommending

Termination 1 (Oct. 13, 2020, 5:03 PM), ECF No. 30-77.  The email created "great distraction and discomfort" at the Center.  *Id.*  In response, on September 25, 2020, Hampton contacted Mark Jaronski, the final decisionmaker on personnel actions, to discuss the situation and ask what action to take.  *Id.*  On September 28, 2020, Jaronski informed Hampton that there had been repeated failed attempts over several years to help Book succeed in her role and work productively with coworkers, and that he wanted to proceed with recommending termination.  At that time, Hampton advised Jaronski that Book was on sick leave and that they would finalize Book's termination when she returned.  *Id.*

Book returned from sick leave on October 12, 2020.[2]  That day, a janitorial supervisor complained to Rivers that Book had accused one of her employees of "something that did not happen."  Rivers Decl. Ex. 4, Report Detailing Incident Between L. Book and ATL West Cleaning Company at DEF00000787 (Oct. 12, 2020, 2:51 PM), ECF

---

[2] There is some disagreement as to the day Book returned to work from her two-week leave in fall 2020, but not enough to create a genuine fact dispute.  Book contends that the day she returned to work, Rivers refused to let her leave early due to a migraine, and later that same day, Jaronski terminated her.  But this assertion is contradicted by the record.  Book admits that she was terminated on October 20, 2020.  And emails exchanged between Book and Rivers show that Book returned to work on October 12, 2020.  Further, Book was involved in a conflict with a member of the janitorial staff at the Center on October 12, 2020.  Although Rivers testified that she did not recall the incident, Rivers contemporaneously reported the incident to Hampton on October 12, 2020.  Therefore, no reasonable jury could conclude that Book returned to work on October 20, 2020.  Accordingly, the Court finds that Book returned to work from leave on October 12, 2020 and that she was terminated on October 20, 2020.

No. 30-83 at 13.   Book responded that she had not made such a complaint, and the conversation between Book and the janitorial supervisor escalated to an altercation that resulted in the temporary closure of the Center.   *Id.*   The next day, Jaronski formally recommended Book's termination.   On October 20, 2020, Jaronski and Hampton came to the Center and terminated Book in person.

DISCUSSION

Book asserts the following claims against the Department: (1) Title VII race discrimination claims; (2) an ADA disability discrimination claim; (3) an FMLA interference claim; and (4) Title VII, ADA, and FMLA retaliation claims.   The Department seeks summary judgment on all these claims.

**I.   Title VII Race Discrimination Claims**

Book brought Title VII claims based on two employment actions: her placement on a performance plan in 2015 and her termination in 2020.   In her response to the Department's summary judgment motion, Book contends that she also suffered race-based harassment.   The Department asserts that any claim based on the 2015 performance plan is time-barred, that Book did not present enough evidence to establish a genuine fact dispute on her termination claim, and that any hostile work environment claim fails as a matter of law.

A.   Claim Based on the 2015 Performance Plan

A plaintiff seeking relief under Title VII must first exhaust her administrative remedies by filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").   42 U.S.C. § 2000e-5(b), (f)(1).   A Title VII plaintiff must file a charge of discrimination with the EEOC within 180 days "after the alleged unlawful employment practice occurred."   *Id.* § 2000e-(5)(e)(1).   If she fails to do so, a Title VII claim based on that employment practice is time-barred.   *H&R Block E. Enters., Inc. v. Morris*, 606 F.3d 1285, 1295 (11th Cir. 2010) (per curiam).   Book filed a charge of discrimination with the EEOC on February 12, 2021.   Book thought about filing a charge of discrimination with the EEOC in 2015, but it is undisputed that she did not do so.   Thus, any Title VII claim that accrued before August 16, 2020 is time-barred.   Book's Title VII claim arising from the 2015 performance plan accrued in 2015 and is, therefore, time-barred.

Book argues that the continuing violation doctrine saves her time-barred Title VII claim because the 2015 performance plan was part of a pattern or series of discriminatory occurrences.   Book cites the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan* for the proposition that if all discriminatory acts are part of the same unlawful practice and at least one of those acts falls within the filing period, then the untimely claims will not be time-barred.   536 U.S. 101 (2002).   Book misreads the

continuing violation doctrine.  *Morgan* drew a distinction between claims based on "discrete discriminatory acts," *id.* at 113, which are not covered by the continuing violation doctrine, and those based on a hostile work environment, which are.  *Id.* at 117; *see id.* at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").  The 2015 performance plan is a discrete act—one that Book knew about when it happened and believed was wrong.  Therefore, the continuing violation doctrine does not apply and cannot save Book's time-barred claims based on the performance plan.[3]

### B.   Claim Based on Book's Termination

Book claims that she was terminated because of her race, in violation of Title VII.  Intentional discrimination may be established through direct or circumstantial evidence.  *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018).  Where, as here, a plaintiff offers no direct evidence of discrimination, the Court evaluates the plaintiff's claims using the familiar *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  Under that framework, the plaintiff has the initial burden of establishing a prima facie

---

[3] To the extent that Book asserts an ADA discrimination claim based on the 2015 performance plan, it is time-barred for the same reasons.  *See* 42 U.S.C. § 12117(a) (incorporating Title VII's exhaustion procedures for ADA disability discrimination claims).

case of discrimination. *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). If a plaintiff can establish the elements of a prima facie case, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 1221. If the employer articulates a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to "demonstrate that the [employer's] proffered reason was merely a pretext for unlawful discrimination." *Id.*

To establish a prima facie case of discrimination, Book must show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for her job, and (4) her employer "treated 'similarly situated' employees outside her class more favorably." *Id.* at 1220-21. The parties do not dispute that Book, a white woman, is a member of a protected class, that she was qualified within the meaning of Title VII, or that she suffered an adverse employment action when she was terminated in October 2020. The Department argues that it is entitled to summary judgment because Book failed to identify a similarly situated comparator who was treated more favorably.

To establish the fourth element of her prima facie case, Book must show that she and her proffered comparators are "similarly situated in all material respects." *Id.* at 1218. To be "similarly situated," the comparator generally needs to have engaged in the

same basic misconduct, been subjected to the same employment policies, shared a supervisor, and shared a similar disciplinary history as the plaintiff. *Id.* at 1227-28. Book identifies Jonathan Spearman and LaRay Cody, who are black, as comparators. Spearman and Cody were subject to the same employment policies as Book and they both reported to Rivers like Book did. But that is where the similarities end.

Book contends that Cody is a valid comparator because she lacked a strong work ethic (in Book's view) and did not complete as many tasks as Book did. Book also asserts that Cody used her smartwatch at work but was not disciplined, while Book was told not to use her cell phone at work. But the key question is whether both Cody and Book engaged in similar misconduct that led to Book's termination but not Cody's. Book did not point to any such evidence. While Book believes that Cody did not work hard enough at her job, Book did not point to evidence that Cody engaged in the same type of misconduct that Book did—including ongoing conflicts with coworkers and supervisors and discussing personal matters with visitors despite repeated admonitions not to. The Court thus finds that Book failed to establish that Cody was similarly situated to her in all material respects.

As to Spearman, Book argues that they were similarly situated because they both got in trouble for discussing personal matters at work, they both had trouble getting along with coworkers, and

they both had attendance issues.  Book pointed to evidence that Rivers individually warned Spearman *once* not to discuss personal matters at work with the janitorial staff when visitors were present.  In contrast, the record shows that Book repeatedly shared her personal matters directly with visitors, despite multiple warnings not to.  With regard to their interpersonal conflicts, Book notes that both she and Spearman were placed on the Communications and Work Plan because they could not get along with each other—so they were treated the same when they engaged in the same misconduct.  Book did not point to evidence that Spearman had similar conflicts with any other coworkers that disrupted the workplace.  Book, though, had ongoing conflicts with multiple coworkers, both of her supervisors, and members of the janitorial staff.  She received a written warning after sending a disrespectful email to her supervisor, then her conflicts with others continued, culminating in an accusatory email to a coworker that caused problems at the Center and an altercation with a janitorial supervisor that resulted in the temporary closure of the Center.  Finally, Spearman and Book were not similarly situated with regard to attendance.  While the record suggests that Spearman had problems with punctuality and taking excessive breaks (and was reprimanded for it), Book routinely took leave and left work early with very little notice, which she admits made it difficult for Rivers to ensure the Center was properly staffed.  Accordingly,

because Book and Spearman did not engage in sufficiently similar misconduct and did not have similar disciplinary histories, Spearman is not a valid comparator.  Having failed to point to a proper comparator, Book has not established a prima facie case of discrimination.

Even if Book had established a prima facie case of discrimination, the Department contends that it terminated Book for legitimate, nondiscriminatory reasons, including (1) Book's conflicts with her supervisors and coworkers, (2) Book's repeated discussion of personal matters with Center visitors, and (3) Book's frequent, last-minute requests for time off and general unreliability attendance-wise.  Because the Department articulated nondiscriminatory reasons for its decision to terminate Book, the burden shifts back to Book to demonstrate that the proffered reasons are not the true reasons, but instead are a pretext for discrimination.  The Court finds that no reasonable jury could find that the Department's reasons for terminating Book were pretextual.

To establish pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1274 (11th Cir. 2017) (quoting *Combs v. Plantation*

*Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  The plaintiff must rebut the employer's proffered reasons "head on" and cannot succeed by "quarreling with the wisdom" of the reasons.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).  Book did not meet this burden.

The Court is unpersuaded by Book's arguments.  First, Book contends that the Department started scrutinizing her attendance when she began running low on paid leave after she reported that she had a new tumor on her head.  To support this argument, Book points to an email from Rivers to Hampton asking if Book would need to use other leave to cover her time off since Book was running low on sick leave.  Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. 6, Email Chain at DEF00000414 (Oct. 5, 2020, 11:45 AM), ECF No. 38-10 at 1.  Hampton forwarded that email to the Department's general counsel and asked for a meeting.  *Id.* (Oct. 5, 2020, 2:52 PM).  But these emails do not support Book's contention that the Department increasingly scrutinized her attendance after it learned that she would likely need more time off.  Rather, the emails simply show that Book's supervisors sought guidance on the proper procedure when Book exhausted her sick leave balance.  Indeed, the parties' citations to the record demonstrate that Rivers regularly notified Book when her sick leave balance ran low and she needed to use annual leave instead.  Defs.' Mot. Summ. J. Ex. 43, Sick Leave Balance Update 1 (Feb. 11, 2020, 5:44 PM), ECF

No. 30-46; Defs.' Mot. Summ. J. Ex. 45, Sick Leave Balance Update 1 (Oct. 6, 2020, 3:09 PM), ECF No. 30-48. Accordingly, the record does not support Book's contention that the Department increased its scrutiny of her attendance when it learned that she would need additional time off.

Book also argues that her good performance evaluations for several years before her termination demonstrate pretext. While Book is correct that the evaluations indicate that she met performance expectations, the most recent evaluation is from June 2019, more than a year before her termination. Many of Book's disciplinary issues occurred after this evaluation. For example, only a few weeks after the 2019 performance review was signed, Hampton warned Book that her frequent, unplanned absences and requests to leave early were making it difficult to ensure that the Center was properly staffed. And in February 2020, Book was given a "final warning" to not discuss personal matters with visitors. Email from K. Hampton to L. Book 1 (Feb. 11, 2020, 11:34 AM), ECF No. 30-15. The very next month, Book had to be reminded again not to discuss personal matters with visitors and was explicitly told that the Department may take "further action" if Book did not understand what topics were appropriate to discuss in the workplace. Hampton Decl. Ex. 6, Email Exchange at DEF00002148 (Mar. 13, 2020, 12:47 PM), ECF No. 30-82 at 25. The Department pointed to evidence that multiple coworkers and both of Book's

supervisors repeatedly complained that Book was difficult to work with and caused conflict at the Center.  And in October 2020, Rivers reported to Hampton that she was forced to temporarily close the Center after Book became engaged in an altercation with a janitorial supervisor.  Book did not point to evidence to rebut the Department's proffered reasons.  She did not dispute that she had conflicts with others and got in trouble for sharing personal matters with Center visitors.  She also pointed to no evidence to dispute that her last-minute absences created staffing challenges. In light of the present record, Book's pre-2020 "meets expectations" performance evaluations do not show that the Department's reasons for terminating Book were pretextual.

Book contends that even if her performance evaluations do not create a fact dispute on pretext, the Department's proffered reasons for terminating her were pretextual because the Department failed to provide a reason for her termination when she was terminated.  While the Department did not specify the reasons for Book's termination at the time of her termination, this fact alone does not rebut the Department's proffered reasons.  At the start of her employment, Book was informed that she was an unclassified employee who could be terminated "at the will of either party"— meaning Book could be terminated with or without a stated reason. Defs.' Mot. Summ. J. Ex. 3, 2014 Personnel Action & Acceptance Letter 2, ECF No. 30-6.  Further, as explained above, the

Department's proffered reasons were consistent with the Department's numerous warnings—both formal and informal—to Book regarding her failure to get along with coworkers, unprofessional behavior with visitors, and frequent, last-minute leave requests. And they were consistent with Jaronski's stated reasons in his recommendation that Book be terminated.  Accordingly, Book has failed to show that the Department's proffered reasons were false and that the real reason for Book's termination was her race.

Book makes a weak attempt to escape summary judgment by arguing that even if the Department had legitimate motives for terminating her employment, it also had discriminatory ones.  This is not a mixed motive case, and if it is, Book has still failed to produce evidence sufficient to create a genuine fact dispute on the issue of whether discriminatory animus motivated the Department at all in its decision to terminate her employment. The Department is entitled to summary judgment on Book's Title VII race discrimination claims.

### C.   Hostile Work Environment Claim

In addition to her Title VII claims based on her 2015 performance plan and 2020 termination, Book contends that she was subjected to racial harassment.  She raised this argument for the first time in her summary judgment response brief.  Her Amended Complaint, however, does not include a hostile work environment claim based on race, and she may not amend her complaint in her

response brief.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam).  Even if Book had pleaded a racial hostile work environment claim, the evidence she cited in her response brief does not create a genuine fact dispute on that claim.  To establish a hostile work environment claim, the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Here, Book contends that the following conduct is actionable harassment: (1) she heard other employees use the "N" word twice as well as the phrase "colored people time" once and (2) she felt belittled when Rivers told her not to be offended by these terms. Nothing about this evidence suggests that Book was subjected to racial harassment that was sufficiently severe or pervasive to alter the conditions of her employment.[4]  Therefore, even if Book had brought a racial hostile work environment claim, she did not

---

[4] Book also asserts that she was scolded for arriving late on some occasions while other employees were not and that other employees used their phones at work but she was not allowed to use hers, though the evidence she cited in her brief does not support these assertions or establish that Book was subjected to a hostile work environment based on her race.

present enough evidence to create a genuine fact dispute on it. The Department is entitled to summary judgment on Book's race discrimination claims.

## II.  ADA Failure-to-Accommodate Claim

In addition to her Title VII claims, Book alleges that the Department failed to accommodate her disabilities in violation of the ADA.  The ADA prohibits employment discrimination against qualified individuals on the basis of known disabilities.  42 U.S.C. § 12112(a).  An employer unlawfully discriminates against a qualified individual on the basis of a disability when the employer fails to make "reasonable accommodations" for the physical or mental limitations of an otherwise qualified individual with a disability—unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business."  *Id.* § 12112(b)(5)(A).  To establish a prima facie case of discrimination based on an employer's failure to accommodate, the employee must show that (1) she has a disability, (2) she is a qualified individual (within the meaning of the ADA), and (3) her employer failed to accommodate her disability. *Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018).  The Department concedes that Book has a disability. But it disputes that Book was a "qualified individual."

A qualified individual with a disability is "an individual who, with or without reasonable accommodation, can perform the

essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). The plaintiff "must show either that [she] can perform the essential functions of [her] job without accommodation, or, failing that, show that [she] can perform the essential functions of [her] job with a reasonable accommodation." *Davis v. Fla. Power & Light Co.,* 205 F.3d 1301, 1305 (11th Cir. 2000). Essential functions "are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007) (quoting *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (per curiam)). Whether a function is "essential" is a case-by-case determination based on several factors. *Davis*, 205 F.3d at 1305. The ADA directs courts to consider the employer's judgment about the essential functions of a position, including the job description and testimony of an employee's supervisor. 42 U.S.C. § 12111(8); *Holly*, 492 F.3d at 1257.

Here, Book does not seriously dispute that being routinely and reliably present at the Center is an essential function of the Information Specialist position. The Information Specialist job, by its very nature, requires employees to be on-site at the Center to greet and assist visitors. Both the Information Specialist job description and the testimony of Book's supervisor confirm that on-site presence is an essential function of the Information

Specialist job.  Book Dep. Ex. 1, Visitor Information Specialist Job Description 1, ECF No. 32-1; Rivers Decl. ¶ 4.  Book appears to concede that she could not fulfill the essential function of greeting and assisting visitors if she was absent from work.  *See Davis*, 205 F.3d at 1306 (recognizing that routine presence can be an essential function of certain jobs); *cf. Jackson v. Veteran's Admin.*, 22 F.3d 277, 279 (11th Cir. 1994) (holding that a housekeeping aide was not qualified under the Rehabilitation Act due to unreliable attendance because the very nature of his job required him to be present on-site each day).  Therefore, Book could not perform the essential function of being reliably present at her job without a reasonable accommodation.

Book contends that she requested a reasonable accommodation for her disabilities each time she asked to take time off, leave early, or take additional breaks.[5]  She argues that she could have performed the essential functions of her job if the Department had honored these requests for time off from work.  To trigger an employer's duty to accommodate under the ADA, an employee must "(1) make a specific demand for an accommodation and (2) demonstrate that such an accommodation is reasonable."  *Owens v.*

---

[5] Book also contends that the Department failed to provide her with a reasonable accommodation when it did not provide her with a written list of job duties so she could reference them.  But Book asked for the list in 2015 and 2016, so even if the Department never honored this request, any claim based on the Department's failure to provide Book with this list is time-barred.  Book Dep. 97:14-100:3; Book Dep. Ex. 20, Email from L. Book to K. Hampton 2 (Nov. 3, 2016, 11:27 AM), ECF No. 32-20.

*Governor's Off. of Student Achievement*, 52 F.4th 1327, 1330 (11th Cir. 2022).[6]  To meet this initial hurdle, an employee must, at the least, identify her disability and link her disability to the requested accommodation by explaining how the accommodation will alleviate workplace challenges posed by her disability.  *Id.* at 1334–35.

Here, Book linked at least some of her requests for time off to her disabilities.  As discussed above, she notified the Department that she had a tumor on her head in September 2019 and told the Department that she needed time off for doctors' appointments to treat the tumor and possibly have surgery.  Then, when Book asked for leave in early 2020, Book notified the Department that she was having mental health issues and that she needed leave to see her psychiatrist and get new medication.  When she returned from leave, Book provided documentation that she had received treatment at a mental health hospital for two weeks. Finally, when Book requested leave in fall 2020, she provided a letter stating that she had an emotional illness, and she explicitly told the Department that when she returned to work from her two-week leave she would need to take more time off for medical treatment of unresolved health issues, including possible surgery.

---

[6] Although *Owens* involved Section 504 of the Rehabilitation Act, the standard for determining whether an employer violates the Rehabilitation Act is the same as the standard under Title I of the ADA, which applies here.  52 F.4th at 1333–34.

The Court is satisfied that Book provided enough information to link at least some of her leave requests to her disabilities. The next question is whether Book established that her leave requests were a reasonable accommodation for her disabilities.

An employee with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation. *See Earl*, 207 F.3d at 1367 (finding that allowing an employee to arrive at work at any time without reprimand was not a reasonable accommodation because it changed the essential functions of the job). An accommodation is only reasonable if it enables the employee to perform the essential functions of the job in question. *Id.* at 1366. What constitutes a reasonable accommodation depends on the circumstances, but it may include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position," among other things. 42 U.S.C. § 12111(9)(B). A plaintiff carries the initial burden of showing that her proposed accommodation is reasonable. *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1265 (11th Cir. 2019).

Book argues that she should have been allowed to take leave any time she experienced symptoms related to a disability caused by her tumor, such as migraines, pain, dizziness, and mobility issues. But Book did not have a clear diagnosis or a treatment plan by the time she was terminated—she was still seeking answers

for her unresolved health issues.  And although Book mentioned that she would likely need surgery for the tumor before the end of 2020, Book does not dispute that she told the Department the same thing in 2019 and never had the surgery.  Thus, Book's accommodation request is properly characterized as a request for indefinite intermittent leave with little or no advance notice.

A leave of absence may be a reasonable accommodation if the leave of absence will allow the employee to perform the essential functions of the job *at a definite time in the near future*, but the ADA does not require an employer to accommodate a disability by granting indefinite leaves of absence.  *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) (reversing the denial of an employer's motion for judgment as a matter of law because the plaintiff "was requesting an accommodation of indefinite leaves of absence so that he could work at some uncertain point in the future").  Book's requested accommodation for indefinite intermittent leave was not reasonable.  The ADA only "covers people who can perform the essential functions of their jobs presently or in the immediate future."  *Id.*  Allowing Book to take leave at any given moment would have eliminated one of the essential functions of the Information Specialist job—to be present and able to help visitors.[7]  The Court thus concludes that Book did not establish

_____

[7] Book contends that the Department could have hired another employee to do her job when she could not.  But the ADA does not require an employer

29

that she was a qualified individual under the ADA, and the Court grants the Department's summary judgment motion on Book's failure-to-accommodate claim.

## III. FMLA Interference Claim

Book also claims that the Department interfered with her right to take FMLA leave to treat her tumor by terminating her without giving her notice of her right to take FMLA leave.  To make out a claim for FMLA interference, a plaintiff must show "that she was entitled to an FMLA benefit and her employer denied her that benefit." *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1274 (11th Cir. 2020).  The employer's motives are not relevant. *Batson*, 897 F.3d at 1331.  Where the claim is based on an employee's termination, however, "an employer may affirmatively defend against the claim by establishing that it would have terminated the employee regardless of her request" for FMLA leave. *Id.*

Book argues that the Department's failure to give her notice of her right to take FMLA leave bars summary judgment.  But her damages must be "a result of" the Department's failure to give her notice. *Munoz*, 981 F.3d at 1275 (quoting *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 2020) (per curiam)).  The only real consequence of the Department's notice failure that

_____

"to reallocate job duties in order to change the essential functions of a job." *Dickey v. Dollar Gen. Corp.*, 351 F. App'x 389, 392 (11th Cir. 2009) (per curiam) (quoting *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997)).

Book points to is that she did not know what might happen if she exhausted both her sick leave and her annual leave.  Pl.'s Resp. to Defs.' Mot. Summ. J. 18-19, ECF No. 38.

To the extent that Book argues the Department interfered with her FMLA rights by terminating her instead of permitting her to take indefinite intermittent leave with little or no advance notice, the Department demonstrated that it would have terminated Book regardless of her request for indefinite intermittent leave. As discussed above, the Department pointed to evidence that it terminated Book because of her discussion of personal matters with visitors, frequent, last-minute leave requests, and her history of conflict in the workplace—including Book's altercation with a janitorial supervisor that resulted in the temporary closure of the Center just prior to her termination.  *See Ferguson v. N. Broward Hosp. Dist.*, 478 F. App'x 565, 567 (11th Cir. 2012) (per curiam) (affirming summary judgment for the employer on an FMLA interference claim despite the plaintiff's termination notice stating that he was fired for taking an "unapproved rest break" because the "overwhelming" evidence showed that the plaintiff was fired for "disregarding company rules, not for a request for leave").  Book offered no evidence that this incident did not occur or that the Department's purported reasons were not the real reasons for her termination.  *See Batson*, 897 F.3d at 1331 (merging the analyses for pretext-based claims and FMLA interference claims

31

premised on termination).  She has created no genuine factual
dispute on these issues.  Accordingly, the Department is entitled
to summary judgment on Book's FMLA interference claim.

## IV.  Title VII, ADA, and FMLA Retaliation Claims

In addition to her other claims, Book brings retaliation
claims under Title VII, the ADA, and the FMLA, asserting that she
was subjected to retaliatory termination.  Under all three
statutes, retaliation claims are governed by the *McDonnell Douglas*
burden-shifting framework.  *Johnson v. Miami-Dade Cnty.*, 948 F.3d
1318, 1325 (11th Cir. 2020) (per curiam) (Title VII); *Batson*, 897
F.3d at 1328–29 (ADA and FMLA).  The prima facie case for a
retaliation claim requires a showing that (1) she engaged in a
statutorily protected activity, (2) she suffered an adverse
employment action, and (3) the action was causally related to the
protected activity.  *Id.*  The Court is not convinced that Book
established a genuine fact dispute on whether she engaged in
statutorily protected activity that was causally related to her
termination.  But even if she has established a prima facie case
of Title VII, ADA, or FMLA retaliation, she has not produced
evidence that the Department's legitimate, nonretaliatory reasons
for firing her were a pretext for unlawful retaliation.  As
explained in the Court's previous discussion, no reasonable jury
could find that the Department's reasons for terminating Book were
pretextual.  Because Book has failed to create a genuine factual

dispute as to whether the Department's termination of her was a pretext for unlawful retaliation, the Department is entitled to summary judgment on Book's Title VII, ADA, and FMLA retaliation claims.

CONCLUSION

For the foregoing reasons, the Department's Motion for Summary Judgment (ECF No. 30) is granted as to all Defendants.


IT IS SO ORDERED, this 8th day of February, 2023.

S/Clay D. Land
_____
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA